JAMES A. HOWARD, Adm'r., In Equity

*vs.*

AMORILLA M. DINGLEY et als.

Androscoggin.    Opinion November 3, 1922.

*An entry on a deposit account in a bank as follows: "A, B, Payable to either, before or after the death of the other" does not constitute a testamentary disposal, as it is neither a gift inter vivos, nor a donatio causa mortis, not being fully executed before the decease of the donor.*

In the instant case the evidence is very clear that while the decedent intended to bestow his bounty upon the defendants, his words and acts as recounted by the witnesses fall far short of the legal requirements necessary to establish either a gift causa mortis, or a trust.

A gift inter vivos, or a donatio causa mortis, must be fully executed before the decease of the donor.   In the latter case the gift must be perfected by delivery with all the formalities necessary to a gift inter vivos, although subject to revocation before the decease of the donor.

Failing to establish a perfected gift, the defendants fail to establish a trust, for the court will not enforce as a trust a transaction intended as a gift, if imperfect for that purpose.

There is but one way of making a testamentary disposal of property and that is by will; the statute of wills was intended and adopted for the express purpose of establishing a legally defined procedure to be employed in giving post mortem effect to an ante mortem disposal of property.

On report.   The decedent, George F. Merrill, died May 27, 1920, at the age of eighty-one years.   Prior to his death he made deposits in several banks the accounts being designated as follows:   "George F. Merrill, Mrs. A. M. Dingley—Payable to either before or after the death of the other."   "George F. Merrill—Isabel D. Kilbreth— Payable to either before or after the death of the other."   "Miss Lorette E. Marquis—Geo. F. Merrill,—Payable to either before or after the death of the other."   "George F. Merrill,—or Carrie A. Dillingham."

The decedent gave certain instructions to C. H. Averill in the event of his death relative to the settlement of his business affairs

and the disposal of what property he might have left. The plaintiff claimed that the deposits in the banks belonged to the estate, while defendants claimed that such deposits respectively belonged 'to them as being gifts causa mortis. A hearing was had upon bill, answers, replication and proof. At the conclusion of the evidence, by agreement of the parties, the cause was reported to the Law Court. Bill sustained. Decree in accordance with the opinion.

The case is sufficiently stated in the opinion.

*George C. Wing and George C. Wing, Jr.,* for plaintiff.

*Harry Manser,* for defendants.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, WILSON, JJ.

HANSON, J. This is a bill in equity brought by the administrator of the estate of George F. Merrill, late of Auburn. At the conclusion of the evidence, by agreement of the parties the case was reported to this court.

The administrator in his official capacity claims certain savings bank books now impounded to await the decision of this court, and the defendants claim to be entitled to possession of said bank books, because they say that George F. Merrill made a gift causa mortis to the persons named in the bank books, that he delivered the books to one C. H. Averill as trustee for the benefit of the defendants as donees, and that the terms of the trust were plain, definite and certain, and it is claimed by defendants' counsel that the intention of the decedent was effectually accomplished.

George F. Merrill died May 27, 1920, at the age of eighty-one years. On September 5, 1918, he deposited in the Lewiston Trust Company, nine hundred and fifty dollars. The account was designated:

George Merrill

Mrs. A. M. Dingley.

Payable to either before or after the death of the other. At the time of his death, there was eight hundred and fifty dollars in this account. On the same date he deposited in the same bank one thousand dollars to the credit of himself and Isabel D. Kilbreth, payable as in the first deposit. At the date of his death there was nine

hundred and fifty dollars in this account. On March 1, 1919, he deposited in the same Trust Company two hundred dollars, to the credit of Miss Lorette E. Marquis and George F. Merrill. This account was payable to either before or after the death of the other. Nothing was withdrawn therefrom. On the same day he deposited in Mechanics Savings Bank of Auburn four hundred dollars, to the credit of

George F. Merrill or Carrie A. Dillingham.

There were no withdrawals from this account. The bank books and ten dollars in currency comprised the estate of Mr. Merrill. That he intended to make the defendants and Mr. Averill his beneficiaries is not controverted. The question for determination here is, was his intention carried into execution?

Mr. Merrill had made his home with Mr. Averill for four or five years and a firm friendship had been established between them. Mr. Merrill had included Mr. Averill in the number to be benefitted by his bounty, and a bank book with a deposit for two hundred dollars in his name was originally with the bank books impounded, but according to the testimony Mr. Averill secured the books from the custodian and drew the money from the banks, which may explain why he is not a party defendant. Mr. Merrill fell ill at Mr. Averill's house, was ill about ten days, and died May 27, 1920. During his sickness, Mrs. Dillingham, one of the defendants, was called in to assist in caring for him. In the final week of his illness he requested her to go to the Trust Company and draw one hundred dollars to be used with the money in his joint account with Mr. Averill to defray his funeral expenses. This she did, taking with her Mrs. Dingley's book and an order on the Trust Company from Mr. Merrill, witnessed by Mr. Averill. On her return to his room with the book and money, a conversation took place which leads to a solution of the question involved. Mrs. Dillingham was asked, "Q—Will you state the conversation that took place then relative to the bank books? A—When I came back with the money he wanted me to sit down by the bed and show him the books. He wanted me to look at the books, and I did. He says, 'You take that hundred dollars and put it with those books and my funeral expenses are to be paid out of it. I want you to put the money with the books and give them to Mr. Averill when I am dead and see that he attends to

everything. I want Mr. Averill to look after everything.' Mrs.
Dillingham again stated: 'He told me to keep those books safe
and give them to Mr. Averill after he died, to deliver them to him
and see that everything was done; he wanted him to attend to all
his business; he had great confidence in him.' 'He wanted him to
see to everything, do all the settling up.' " Mrs. Dillingham stated
further in relation to Mr. Merrill: "He had said before he had got
his property all arranged as he wanted it . . . . and he thought
it wouldn't have to be administered on." "He had made a will,
and then he thought that would have to be administered on, so much
red tape gone through; he decided to have them put into bank
books," and he destroyed his will. "The book for two hundred
dollars bearing his name with that of Charles H. Averill was to be
used with the one hundred dollars in money to pay his funeral
expenses, and the balance to go to Mr. Averill." Mrs. Dillingham
testified that she gave Mr. Averill the instructions she had received
from Mr. Merrill.

The foregoing comprises all the material testimony of Mrs. Dilling-
ham, except that she stated that a note for fifty dollars which she
had given Mr. Merrill "was to come out of her bank book," "it had
got to be paid." And she stated further that she delivered the bank
books to Mr. Averill several days before Mr. Merrill died. Mr.
Averill in direct examination answered as follows: "What instruc-
tions did you receive in regard to them?" Averill answered: "They
were passed to me with the instructions that I was to see that his
affairs were settled up, and the books should go to the one they
were made out to." "Q—Had Mr. Merrill made any talk with you
himself relative to what you should do in case of his death? A—He
had.

"Q—What was it? A—That I should look after his business when
he got through.

"Q—Did he make any statements as to what he had done with his
property? A—Why, he told me that he had made it out in bank
books and fixed it just the way he wanted it to go so there would be
no fuss about it.

"Q—Were there any items, any details that you think of that he
told you relative to what he wanted you to do? A—Yes, about two
weeks before he died he brought these bank books into my kitchen

and showed them to me, and says, 'if anything happens to me I want you to know I have got these bank books, and I want you to see that they go where they belong.' "

Mr. Averill was asked by his counsel,—"Q—Did he (Mr. Merrill) say anything to you about his funeral or anything of the kind," and he answered, "Never." In cross-examination he disclaimed all knowledge as to how the funeral charges were to be paid, that "nothing had been said about it, Uncle George (Mr. Merrill) never mentioned it." He denied knowledge of, or responsibility for debts and expenses of illness and funeral of the decedent, although they total nearly four hundred dollars; denied that he hired the undertaker, and stated that Mr. Merrill sent for the undertaker himself, notwithstanding the testimony of the physician and others that for the last few days of his illness Mr. Merrill was in a state of coma; contradicted Mrs. Dillingham's statement that he had witnessed the order on the bank, and finally stated that he had no conversation with Mr. Merrill in relation to the bank books after they were delivered to him by Mrs. Dillingham. Mrs. Catherine W. Page, a trained nurse in attendance, testified: "A—I saw Mrs. Dillingham when she gave the bank books to Mr. Averill.

"Q—Did you hear what was said by Mrs. Dillingham to Mr. Averill?

"A—I did. Q—What was said? A—She brought out the books and said that Mr. Merrill wanted him to take the books and settle up the business. Q— Was that practically all that was said at that time? A—I don't remember any other conversation . . . Mr. Averill took the books and put them in a sideboard in the same room."

It is urged by counsel for the defendants in his very able and helpful brief that the facts disclosed sustain his contention that a gift *causa mortis* was perfected, and that a trust was created for the benefit of the defendants, in plain, definite, and certain language, empowering C. H. Averill as trustee to deliver said bank books to the defendants. We are not able so to conclude. On the contrary, the evidence is very clear that while the decedent intended to bestow his bounty upon the defendants, his words and acts as recounted by the witnesses fall far short of the legal requirements necessary to establish either a gift *causa mortis*, or a trust.

No witness testifies that on or after the delivery to Mr. Averill, the bank books were to be turned over to any person. The instruc-

tions to Mr. Averill were "to attend to everything," "to look after everything," "do all the settling up," "and settle up the business." This testimony comes from Mrs. Dillingham and Mrs. Page, the only witnesses professing any knowledge of the facts when and after the books were delivered to Mrs. Dillingham. Mr. Averill denies any conversation with Mr. Merrill after the receipt of the bank books, but says that before Mr. Merrill became ill "he brought these bank books into my kitchen and showed them to me, and says 'if anything happens to me I want you to know I have got these books, and I want you to see that they go where they belong.' " The latter is the only testimony tending to sustain a gift *causa mortis*, but it was made while the decedent was in his usual health, and could at best be taken as an evidence of his intention to give, and which as has been seen was not carried out as required by law. Of such testimony our court has said: "A gift inter vivos, or a donatio causa mortis, must be fully executed before the decease of the donor. In the latter case the gift must be perfected by delivery with all the formalities necessary to a gift inter vivos, although subject to revocation before the decease of the donor. Otherwise, the door through which real and personal property must pass, would be left not only ajar, but propped wide open, to every species of fraud that ingenuity in the invention of evidence might be able to devise." *Maine Savings Bank* v. *Welch*, 121 Maine, 49. *Barstow et al.* v. *Tetlow, Apt.*, 115 Maine, 96; *Weston* v. *Hight*, 17 Maine, 287. Failing to establish a perfected gift, the defendants fail to establish a trust, for the court will not enforce as a trust a transaction intended as a gift, but imperfect for that purpose. *Norway Savings Bank* v. *Merriam*, 88 Maine, 146; *Cazallis* v. *Ingraham*, 119 Maine, 240. There were no words used by decedent or witness indicating a gift of a bank book to any person, and no words used creating a trust, or from which the court would be justified in declaring that a constructive trust resulted. The record discloses an attempted testamentary disposition of his property after death, on the part of Mr. Merrill, an attempted evasion of the statute of wills. The attempt was ineffectual. "There is but one way of making a testamentary disposition of property and that is by will; the statute of wills was invented and adopted for the express purpose of establishing a legally defined procedure to be employed in giving post mortem effect to an ante mortem disposal of property." *Maine Savings Bank* v. *Welch*, supra.

The bank books remained the property of Mr. Merrill at the time of his death, and belong to the administrator to be disposed of according to law.

The entry will be,

> *Bill sustained.*
> *Decree in accordance with this*
> *opinion.*